**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMES MCKINNEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 10 C 2134** |
| | ) | |
| **v.** | ) | **Magistrate Judge Michael T. Mason** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Plaintiff, James McKinney ("McKinney" or "claimant"), filed a motion for summary judgment [21] seeking review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying McKinney's claim for disability benefits under the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d). The Commissioner filed a response [23] asking this Court to affirm the decision of the Administrative Law Judge. We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, McKinney's motion for summary judgment is granted in part and denied in part.

## I.    BACKGROUND

### A.    Procedural History

McKinney filed an application for period of disability and disability insurance benefits ("DIB") on February 16, 2007, alleging disability due to syringomyelia and Chiari

malformations.[1]  (R. 114-116.)  Claimant alleged an onset date of November 10, 2006.

(*Id.*).  The Social Security Administration denied McKinney's application initially on April

4, 2007, and upon reconsideration on July 16, 2007.  (R. 66 -70, 74-77.)  Thereafter,

claimant made a timely request for a hearing.  (R. 79.)  On April 23, 2009, claimant

appeared with counsel for a hearing before Administrative Law Judge Joel G. Fina

("ALJ" or "ALJ Fina").  (R. 23-59.)

On May 7, 2009, ALJ Fina issued a written opinion denying McKinney's claim for

disability benefits.  (R. 8-19.)  McKinney filed a timely request for review of the ALJ's

decision, (R. 60), which the Appeals Council denied on March 5, 2010.  (R. 1-3.)  The

ALJ's ruling then became the final decision of the Commissioner.  *See Zurawski v.*

*Halter*, 245 F. 3d 881, 883 (7th Cir. 2001).  This action followed.

### B.    Medical History

#### 1.    Claimant's Treating Physicians

The majority of the medical records in evidence were submitted by claimant's

treating physician, Dr. Diana Burda.  During a May 14, 2004 visit with Dr. Burda,

McKinney reported that he had discontinued treatment with a neurosurgeon.  (R. 250.)

Claimant told Dr. Burda that "there's nothing else [the neurosurgeon] can do" for him.

(*Id.*)  On April 14, 2005, claimant entered the emergency room at Palos Community

Hospital complaining of right side facial pain and a headache associated with

---

[1] At certain places throughout the record, claimant's application date is listed as October 12, 2006.
(*See, e.g.*, R. 11, 211.)  However, the application itself is dated February 16, 2007.  (R. 114.)  Claimant
also filed an application for supplemental security income ("SSI") on February 16, 2007, which the Social
Security Administration denied.  (R. 110-113.)  Claimant did not preserve his right to appeal that
application.  (*See* R. 73.)

syringomyelia and Chiari malformations.[2]  (R. 264.)  A head CT revealed a mucous

retention cyst within the left maxillary sinus.  (R. 266.)  On June 15, 2006, an associate

of Dr. Burda at Adult Medical Associates examined claimant and noted that he

experienced "severe lower abdominal pain" after heavy lifting.  (R. 245.)

McKinney was admitted to Palos Community Hospital on September 19, 2006

after he went to the emergency room complaining of lower back pain.  (R. 224-225.)

According to McKinney, the pain started when he was reaching for something in the

refrigerator.  (R. 224.)  His legs got weak and he fell to the floor.  (*Id.*)  The emergency

room physician noted claimant's "unusual history of Arnold-Chiari syndrome," as well as

his history of spasms in the left side of his body, and a loss of some function to the left

side.  (*Id.*)  The doctor further reported that claimant appeared to have less sensation in

his left foot than his right.  (*Id.*)

Dr. Burda examined claimant at Palos Community on September 20, 2006.  (R.

228-229.)  She noted that McKinney had "a past medical history significant for spinal

surgery with shunt with Arnold-Chiari deformity and brain surgery repeated in 1998 with

---

[2] Syringomyelia is "a disorder in which a cyst forms within the spinal cord.  This cyst, called a syrinx, expands and elongates over time, destroying the center of the spinal cord.  Since the spinal cord connects the brain to nerves in the extremities, this damage results in pain, weakness, and stiffness in the back, shoulders, arms, or legs.  Other symptoms may include headaches and loss of the ability to feel extremes of hot and cold, especially in the hands.  Each patient experiences a different combination of symptoms."  National Institute of Neurological Disorders and Stroke, Syringomyelia, http://www.ninds.nih.gov/disorders/syringomyelia/syringomyelia.htm (last visited Aug. 16, 2011).

Chiari malformations are "structural defects in the cerebellum, the part of the brain that controls balance.  When the indented bony space at the lower rear of the skull is smaller than normal, the cerebellum and brainstem can be pushed downward.  The resulting pressure on the cerebellum can block the flow of cerebrospinal fluid (the liquid that surrounds and protects the brain stem and spinal cord) and can cause a range of symptoms including dizziness, muscle weakness, numbness, vision problems, headache, and problems with balance and coordination."  National Institute of Neurological Disorders and Stroke, Chiari Malformations, http: www.ninds.nih.gov/disorders/chiari/chiari.htm (last visited Aug. 16, 2011).

permanent disability, paresthesias, and spasms for which he takes Neurontin." (R. 228.) Dr. Burda obtained a CT scan of claimant's lumbar spine and found "small disc bulges at the L3-4, L4-5, and L5-S1 levels." (R. 235.) Dr. Burda also noted mild facet hypertrophy at the L3-4 level, mild central spinal stenosis and facet arthropathy at the L4-5 level, and facet hypertrophy at the L5-S1 level. (*Id.*)

Dr. Burda submitted a memorandum from claimant's neurosurgeon, Dr. Abdul Amine, dated November 10, 2006. (R. 253.) It appears that McKinney visited Dr. Amine on November 7, 2006, complaining of spasms, pain, and discomfort in the back of his neck, left arm, and left shoulder. (*Id.*) Dr. Amine indicated that McKinney had not visited his office since December of 2002 and that claimant "was known to have syringomyelia, which was treated. His Arnold Chiari was decompressed." (*Id.*) Dr. Amine stated that he did not have "much to offer" McKinney and recommended a prescription for Prolexine and Elavil. (*Id.*)

On October 9, 2008, McKinney visited Dr. Burda at Blue Island Medical Center. (R. 313.) Dr. Burda stated that McKinney was "sent here by his lawyer to start disability papers." (*Id.*) She referenced a "brain problem" and a history of "seizure spasms." (*Id.*)

Dr. Burda completed a Physical Impairment Residual Functional Capacity ("RFC") Questionnaire for claimant dated March 5, 2009. (R. 306-11.) In this document, Dr. Burda diagnosed McKinney with "Arnold Chiari and Syringomyelia," and found him incapable of even low-stress jobs. (R. 306, 308.) Dr. Burda indicated that McKinney had spasms ten to twenty times a day, often causing him pain severe enough to interfere with attention and concentration. (R. 307.) She found that McKinney could

sit, stand, or walk with normal breaks for less than two hours in an eight-hour work day. (R. 308.) His impairments would "likely produce good and bad days," result in work absences more than four times a month, and require him to take unscheduled breaks during an eight-hour work day. (R. 309, 311.)

### 2. State Agency Consultants

On March 27, 2007, Dr. M.S. Patil completed a consultative examination of claimant for the Bureau of Disability Determination Services. (R. 285-89.) Dr. Patil indicated that claimant had been diagnosed with syringomyelia twenty years ago. (R. 288.) He reported that McKinney treated his syringomyelia with cerebral shunting and surgery on the back of his neck that resulted in mild numbness in his left extremities. (R. 285, 288.) He noted that claimant reported recurrent muscle spasms in his left leg and arm. (R. 285.) McKinney told Dr. Patil that he had "seizures" and described them by stating, "my left extremities lock up on me once or twice a week for a minute or two." (*Id.*) These incidents caused claimant mild pain in his left arm and leg and occurred when he performed "a lot of physical work." (*Id.*) McKinney denied loss of consciousness, clonic/tonic movements, biting of the tongue, loss of bladder/bowel control, headaches, blurry vision, and gait imbalance. (*Id.*) Claimant told Dr. Patil that he took Neurontin "as needed." (*Id.*)

Dr. Patil concluded the examination with a diagnostic impression of McKinney's "Syringomyelia, Seizure Disorder, and History of Chiari Syndrome." (R. 288.) He determined that "except for posterior neck surgical scar, clinical examination [was] essentially negative at the present time." (*Id.*) At the examination, McKinney did not display "localized neurovascular deficits, atazia, muscle atrophy, anemia, tremors,

fasciculation, seizure activity, pedal edema, or hepatosplenomegaly." (*Id.*) Claimant did not have "swelling, tenderness, redness, or deformity of any joint," and "cardiopulmonary, abdominal, neurological, and extremity examination [was] essentially negative." (*Id.*) McKinney displayed normal gait, speech, and mentation and was in "stable condition at the present time." (*Id.*) Dr. Patil noted that since claimant's cerebral shunt surgery in 1998, McKinney had not been hospitalized for complications. (*Id.*) He also reported that claimant had an MRI of the brain five years ago and that claimant consulted his primary physician every three months. (*Id.*)

Dr. Frank Jiminez reviewed claimant's record and completed a "Physical Residual Functional Capacity Assessment" dated March 29, 2007. (R. 290-97.) Dr. Jiminez determined that McKinney did not have any exertional limitations. (R. 291.) However, he found slight postural and environmental limitations due to seizure disorder. (R. 292, 294.) Dr. Jiminez indicated that claimant had a "normal neurological exam," "normal gait and statation," and that a "muscuoloskeletal exam shows slight decreased range of motion in lumbar spine." (R. 297.) He noted that "claimant states in [consultative exam] ongoing regular treatment," but records from Dr. Burda indicated that claimant had not seen her "since 2004." (*Id.*) Dr. Jiminez further reported that "claimant states he takes [Neurontin] as needed rather than as prescribed." (R. 297.) On July 6, 2007, Dr. Young-Ja Kim reviewed claimant's record and completed an Illinois Request for Medical Advice form that affirmed the findings of Dr. Jiminez. (R. 298-300.)

C.   **Claimant's Testimony**

McKinney provided the following testimony at the hearing before ALJ Fina on April 23, 2009. He was born on August 4, 1966 and is left-handed. (R. 31.) At the time

6

of the hearing, he was 6' 2'' and weighed 255 pounds.  (*Id.*)  Claimant completed two and a half years of high school and has not received any additional training certificates or licenses.  (R. 31-32.)  McKinney was married for twelve or thirteen years, but got a divorce about a year or a year and a half before the hearing.  (R. 28, 31.)  Claimant takes care of his "personal needs," such as showering, shaving, and cooking.  (R. 36-37, 47.)  He has a valid drivers license and drives a minivan.  (R. 36-37.)

McKinney worked as a roofer from 1984 to 1998 and then as a shipper and receiver for Process and Controls Systems, Inc. ("PACS") until 2006.[3]  (R. 33, 49, 53.)  At PACS, claimant performed janitorial and maintenance tasks for an eight-hour work day.  (R. 53.)  However, claimant often left work early due to severe headaches.  (R. 49-50.)  When asked how many times in a month he left work early, claimant responded "in a month, I'd say at least a week's worth."  (R. 50.)  McKinney stopped working for PACS when he could no longer function.  (R. 33.)

At the time of the hearing, claimant lived with his ex-wife in an apartment above a bar and grill that she owned.  (R. 29.)  According to claimant, his ex-wife feels sorry for him because of his condition.  (R. 49.)  She pays the bills for the apartment, provides claimant meals, and gives him money for cigarettes.  (R. 39.)  In exchange, claimant works approximately two to three hours a day in his ex-wife's bar.  (R. 32, 44.)  He takes out the trash, relaxes for an hour, and then mops the kitchen floor of the bar.  (R. 32.)  McKinney testified that these tasks take him two hours more to complete than they would take an average person.  (*Id.*)  To take out the trash, McKinney carries the

---

[3] Claimant did not testify at the hearing about the exact dates he worked at each position, but he provided the dates in his "Work History Report."  (R. 174.)

garbage bags about twenty to thirty feet and hoists them into a dumpster. (R. 32-33.) McKinney also signs receipts for food and liquor deliveries sent to the bar. (R. 45.) He uses the company credit card to purchase goods for the bar, but does not write checks. (R. 45-46.) One to two days in a seven-day week, claimant is unable to do any work at the bar. (R. 49.) Although he is not as social as he was in the past, he occasionally socializes with patrons at the bar, which holds seventy people. (R. 33, 41-42.) He stated that he was "probably" depressed. (R. 42.)

Claimant testified that Dr. Brown at the University of Chicago treated his Chiari malformations with spinal shunt surgery, during which a drain was placed in his spine. (R. 34-35.) McKinney testified that after this surgery, "they told me to go on disability, because I'm only going to get progressively worse." (R. 36.) However, claimant alleged that he was able to continue working as a roofer at that time. (*Id.*)

McKinney testified that he had a second surgery on his head eight or nine years prior to the hearing. (R. 36, 41.) He alleged that after this surgery he was no longer able to stand on roofs at his roofer position. (R. 36.) McKinney stated that the neurosurgeon who performed this surgery told him "there's nothing else they could do" for him. (R. 41.) Claimant testified that he visits Dr. Burda to receive four-month scripts of Neurontin, a medication that he takes three times a day at a dose of 350 milligrams. (R. 35, 41.)

Claimant testified that he experiences constant pain, numbness, and spasms. (R. 40.) He also believes that syringomyelia gives him stomach aches. (R. 34.) He testified that he has spasms in his left arm about twenty times a day and occasionally in his right leg. (R. 35.) When he bends over, works "over [his] head," coughs, or laughs, fluid in

his spine presses against his brain and disrupts his "equilibrium." (*Id.*) Claimant testified that the spasms cause his left hand to "crunch up" and force him to set down or drop anything in that hand. (R. 50-51.) He described experiencing spasms while driving, stating that his left side will lock up for thirty seconds and he will grab the steering wheel. (R. 51.) According to McKinney, Dr. Burda did not instruct him to avoid driving. (*Id.*)

Claimant's spasms also trigger massive headaches. (R. 35-36.) Following the headaches, McKinney becomes discombobulated and experiences severe pain in the back of his head at the place of his surgery. (R. 50.) McKinney claims that he tried taking Aspirin for his headaches, but stated that only sleep provided relief. (*Id.*) He reported that he is often functional in the morning before the spasms began. (R. 37.) McKinney further testified that he falls down once a week from dizziness. (R. 40.)

Claimant testified that he can stand and walk for about one hour before he has to sit down. (R. 39.) He can remain seated for less than an hour before having to get up and move around. (R. 39-40.) Claimant alleged that he can lift thirty to forty pounds, but that after he lifts that amount of weight he becomes dizzy and loses his balance. (R. 40.)

### D. Vocational Expert's Testimony

Vocational Expert Dr. Richard Hamersma ("VE" or "VE Hamersma") also testified at the hearing before the ALJ on April 23, 2009. (R. 51.) The VE described claimant's past work as a roofer as medium in exertion and semi-skilled, and his work as a shipper and receiver as medium in exertion and unskilled. (R. 54.) The VE described claimant's current employment at the bar and grill as "janitorial," a position that is

9

typically light or medium in exertion and unskilled.  (R. 54-55.)  VE Hamersma further characterized McKinney's current work as "sympathetic employment."  (R. 54.)  He noted that claimant took more time to complete tasks than if he was "competitively employed" and on some days did not perform any work.  (*Id.*)

The ALJ asked VE Hamersma to consider a hypothetical person with claimant's age, education, work experience, and skill set who possessed the following limitations: lifting or carrying a maximum of twenty pounds on occasion and ten pounds frequently in light work; never climbing ladders, ropes, or scaffolds; occasionally climbing ramps or stairs, stooping, crouching, or kneeling; frequently balancing; never crawling; occasionally reaching overhead with the left dominant upper extremity with no restriction to the right non-dominant upper extremity; frequently handling objects, "meaning gross manipulations with the left dominant upper extremity, with no restriction to the right non-dominant upper extremity;" frequently fingering with the left dominant upper extremity without restriction to the non-dominant right upper extremity; and avoiding concentrated exposure to unprotected heights.  (R. 55.)  VE Hamersma testified that such an individual could not perform claimant's past work as a roofer or as a shipper and receiver.  (*Id.*)  However, the VE explained that this hypothetical person could perform other light and unskilled jobs in the regional and national economy.[4]  (R. 56.) These positions included approximately 8,000 assembly jobs, 7,000 hand packaging jobs, and 6,500 inspection jobs.  (*Id.*)

The ALJ then asked the VE to consider the same hypothetical person, but

_____

[4]  VE Hamersma defined the region as the Chicago Metropolitan area and the six surrounding counties.  (R. 52.)

reduced the exertional level from light to sedentary. (R. 56.) This new individual could "lift up to ten pounds occasionally in sedentary work as defined by the regulations." (*Id.*) VE Hamersma testified that this person could work as a cashier in one of 4,000 jobs, as a hand packager in one of 3,000 jobs, and as a telephone solicitor in one of 5,000 jobs in the regional or national economy. (*Id.*)

Next, the ALJ added to the previous hypothetical a "sit stand option," allowing the individual to sit or stand alternatively at will provided that the person would not be taken off task for more than ten percent of the work period. (R. 56.) VE Hamersma testified that this individual could work in the same jobs and numbers as cited in the previous hypothetical. (R. 56-57.)

Finally, the ALJ asked VE Hamersma what employers customarily expect from employees "in terms of absences and routine rest or break periods." (R. 57.) The VE testified that employers usually allow employees one to two absences a month, a fifteen minute break in the morning, a half hour to an hour lunch break, and a fifteen minute break in the afternoon. (*Id.*) An individual who exceeded these limits on a regular basis would not be able to perform the jobs that the VE had previously cited or work in a competitive environment. (*Id.*) Further, according to the VE, a person who could not engage in sustained work activity for eight hours a day, five days a week would be precluded from full-time competitive employment at any exertional level. (*Id.*) The VE also testified that an individual who was off task 15% of the day due to spasms or headaches would be "intolerable." (R. 58.)

E.     **Third-Party Submissions**

1.     **Claimant's Ex-wife**

11

Claimant's ex-wife, Kathleen A. McKinney ("Ms. McKinney"), completed a third party function report dated March 16, 2007. (R. 149-156.) In this document, Ms. McKinney indicated that claimant could no longer do "any lifting" or bend over. (R. 150.) She alleged that his impairments also affected his ability to reach, use his hands, and stand, and his ability to get a full night of sleep. (R. 150, 153.) When asked to describe claimant's daily activities, Ms. McKinney responded that he cooks and cleans at work and then watches television in bed most nights. (R. 149.) He has no problems with personal care, and can cook a full meal for himself. (R. 151.) She reported that claimant could walk three to four blocks before needing a ten minute rest. (R. 153.) According to Ms. McKinney, claimant could "do things well" for half of the day before becoming tired. (R. 155.) She further noted that claimant spent time with others everyday at work. (R. 152.)

Ms. McKinney also submitted a letter dated November 6, 2008. (R. 304-05.) She indicated that claimant currently lived in her apartment in a separate bedroom. (R. 305.) She took care of "all of his personal needs" and covered "the expense of food, cloth[ing], and toiletries." (*Id.*) She stated that claimant helped her in her bar, but that he did not receive a pay check and could not keep a set schedule. (*Id.*) She indicated that claimant became depressed and no longer saw his friends or went anywhere. (*Id.*)

Additionally, Ms. McKinney reported that claimant had over twenty spasms a day in his arm, resulting in headaches and dizziness. (R. 304.) The spasms often interfered with claimant's vision, speech, bladder control, and motor skills. (*Id.*) She stated that the spasms caused numbness in his limbs, choking fits, and pain that "control[led] his life." (*Id.*) According to Ms. McKinney, the spasms occurred when claimant did

anything strenuous. (*Id.*) Although sleep is "the only thing that can help," claimant often suffers from insomnia. (*Id.*) She reported that after claimant's first brain surgery almost twenty years ago, doctors told him to seek disability benefits and that over the years he was told to stop working and "go on welfare." (*Id.*) She explained that claimant had an "undisputable" work ethic and that his pride "kept him from just seeking a check from the government." (*Id.*)

### 2. Claimant's Former Employer

Claimant's former employer, John Wojcik, submitted a letter dated October 13, 2008. (R. 301-02.) Wojcik is the president of PACS, where McKinney worked as a shipper and receiver from October of 1998 through December of 2006. (R. 301.) According to Wojcik, claimant experienced "attacks," which he described as "seizures, extreme spasms, possibly something like a Charley Horse, only much more severe." (R. 302.) In one form of the attacks, typically lasting thirty seconds, McKinney's left arm curled, his face contorted, and his eyes closed. (*Id.*) During these attacks, claimant occasionally "would bang his arm into a brick wall or floor" or "would fall to the floor and roll around in pain." (*Id.*) In a second form of the attacks, which often lasted ten minutes or longer, McKinney suffered from unusual headaches. (*Id.*) Wojcik described these attacks as a "spasm to the back of his brain." (*Id.*) While experiencing either type of attack, McKinney "was completely dysfunctional." (*Id.*) While claimant returned to normal after the spasms, following the headaches, he appeared incoherent for the rest of the day. (*Id.*)

As time went on, the attacks "became more frequent and severe, making him a liability." (*Id.*) Claimant also started mixing up numbers and had difficulty writing. (*Id.*)

13

McKinney purportedly left PACS on his own accord when he "became involved in a family business." (*Id.*)

### 3.    Claimant's Former Mother-In-Law

Claimant's former mother-in-law, Carol Mae Jesse, also submitted a letter, which was dated November 5, 2008. (R. 303.) Jesse indicated that following the onset of McKinney's disability, he "had difficulty with simple things" and his limitations were becoming more severe. (*Id.*) She stated that claimant could no longer sit or stand for any length of time and could no longer follow simple instructions. (*Id.*) She alleged that claimant became a "recluse" who no longer interacted with friends and preferred to stay away from people and crowded places. (*Id.*)

## II.    LEGAL ANALYSIS

### A.    Standard of Review

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We must consider the entire administrative record, but we will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary

support or an adequate discussion of the issues." *Id.* While the ALJ "must build an accurate and logical bridge from the evidence to his conclusion," he need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993)

**B.     Analysis Under the Social Security Act**

To qualify for disability insurance benefits, claimant must be "disabled" under the Social Security Act (the "Act"). A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which... has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski*, 245 F.3d at 885-86. If the claimant reaches step five, the burden then shifts to the Commissioner to show that "claimant is capable of performing work in the national economy." *Id.* at 886.

ALJ Fina followed this five-step analysis. At step one, the ALJ found that

"claimant has not engaged in substantial gainful activity since November 10, 2006, the alleged onset date." (R. 13.) At step two, the ALJ determined that claimant has the following severe impairments: syringomyelia and Arnold-Chiari malformation. (*Id.*) At step three, the ALJ found that "claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (*Id.*)

Next, ALJ Fina determined that claimant had the RFC to "perform sedentary work as defined in 20 C.F.R. 404.1567(a), allowing claimant the option to sit or stand alternatively at will provided that claimant is not taken off task more than ten percent of the work period." (*Id.*) He found that claimant could "never climb ladders, ropes, or scaffolds, or crawl." (R. 13-14.) Further, the ALJ found that claimant could occasionally climb ramps or stairs, stoop, crouch, kneel, and "reach overhead with the left dominant upper extremity with no restriction to the right non-dominant upper extremity." (R. 14.) The ALJ also determined that claimant could frequently balance, "handle objects (gross manipulation) with the left dominant upper extremity with no restriction to the right non-dominant upper extremity," and "finger (fine manipulation) with the left dominant upper extremity with no restriction to the right non-dominant upper extremity." (*Id.*) Finally, the ALJ found that "claimant must avoid concentrated exposure to unprotected heights." (*Id.*)

At step four, the ALJ found that claimant was "unable to perform any past relevant work." (R. 18.) Finally, at step five, the ALJ concluded that there were "jobs that exist in significant numbers in the national economy that the claimant can perform." (*Id.*)

McKinney now argues that the ALJ (1) failed to properly address whether he met or equaled a listed impairment; (2) failed to make a proper credibility determination; and (3) erred in making his residual functional capacity determination.

### C.     The ALJ Erred in Explaining Whether Claimant Met or Equaled a Listing.

McKinney first challenges the ALJ's finding that claimant's impairments did not meet or medically equal a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  ALJ Fina explained his finding at step three as follows:

> All of the opinions of record from medical or psychological consultants designated by the Commissioner are in agreement.  The claimant does not have an impairment that meets or equals the criteria of any listed impairment. This includes opinions from the State agency medical consultants.  Based on my review of the record, I find no reason to conclude otherwise.

(R. 13.)  According to McKinney, the ALJ's failure to analyze the relevant listings for syringomyelia and epilepsy requires remand.  As explained below, we agree in part.

It is undisputed that the claimant bears the burden to show that his impairments meet or equal a listed impairment.  *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). To meet this burden, the claimant must satisfy all of the criteria of a listed impairment. *Id.*  However, an ALJ "should mention the specific listings he is considering and his failure to do so, if combined with a perfunctory analysis of the listing, may require remand."  *Ribaudo v. Barnhart*, 458 F. 3d 580, 583 (7th Cir. 2006).  As the Seventh Circuit has noted, failure to discuss evidence in light of an applicable listing can leave the reviewing court with "grave reservations" as to whether the ALJ's factual assessment adequately addressed the criteria of the listings.  *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

## 1.    Listing 11.19: Syringomyelia

Even after determining that McKinney's syringomyelia constituted a severe impairment at step two, the ALJ failed to address listing 11.19 in his step three finding. Instead, the ALJ simply stated that he found no reason to disagree with the conclusion of the state agency medical consultants that McKinney did not meet or equal any listings.

To meet listing 11.19 for syringomyelia, a claimant must show: (a) "significant bulbar signs;" or (b) "disorganization of motor functions as described in 11.04B." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 11.19. In 11.04B, "disorganization of motor functions" is described as, among other things, "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)."[5]

Here, contrary to the Commissioner's assertion, McKinney presented medical evidence at least suggesting that his impairments meet or equal listing 11.19. McKinney's syringomyelia diagnosis is well documented and the record includes evidence of significant and persistent disorganization of motor functions in two extremities as described in 11.04B. On September 19, 2006, an emergency room physician noted claimant's history of spasms in the left side of his body, as well as a loss of some function to the left side. (R. 224.) The doctor further reported that

---

[5]11.00C: Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia, and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of this impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

claimant appeared to have less sensation in his left foot than his right.  (*Id.*)  The following day, Dr. Burda reported that claimant had "permanent disability, paresthesias, and spasms."  (R. 228).  Dr. Burda reviewed a CT scan on claimant's spine and indicated spinal cord and nerve dysfunction, such as small disc bulges, spinal stenosis, mild facet hypertrophy, and mild facet arthropathy.  (R. 235.)  Dr. Amine noted that as of November 7, 2006 McKinney experienced spasms affecting his back, neck, left shoulder and left arm.  (R. 253.)  The medical records are consistent with claimant's own testimony regarding spasms and their effect on his motor functions.

Where, as here, the record contains medical evidence that could support a finding that claimant meets or equals listing 11.19, and that refutes the findings of the agency consultants on the listing issue, the ALJ's perfunctory analysis is insufficient. *See Ribaudo*, 458 F.3d at 584 (remanding for a more thorough analysis where ALJ failed to mention the relevant listing and failed to evaluate any of the favorable evidence on that listing's required criteria); *Robinson v. Astrue*, 667 F. Supp. 2d 834, 841 (N.D. Ill. 2009) (remanding where the ALJ provided only a perfunctory discussion at step three and the record contained evidence that the claimant met the listing for syringomyelia); *see also*, *Moore, Sr. v. Astrue*, No. 09 C 0036, 2010 WL 3522948, *11-12 (N.D. Ill. Sept. 02, 2010) (remanding for a perfunctory step three analysis).  We disagree that the mere recitation of some of the medical evidence supporting the listing can take the place of a well-reasoned step three analysis or warrants a finding that the ALJ properly considered that evidence.  The ALJ's insufficient analysis is further compounded when we note, as did claimant, that, without explanation, the ALJ accepted the agency consultants' conclusion on the listing issue, but rejected their conclusion on the issue of exertional

limitations. These shortcomings have left us unable to trace the path of the ALJ's reasoning. *Carlson v. Shalala*, 999 F.2d at 181; *see also Washington ex rel. Stewart v. Barnhart*, 481 F.Supp.2d 905, 917 (N.D. Ill. 2007) (finding that absent a discussion of favorable medical evidence and its application to the listing, the court was unable to perform any sort of meaningful judicial review).

For these reasons, we remand this matter for further consideration of claimant's syringomyelia in the context of listing 11.19. In doing so, we reach no conclusion, nor could we, as to whether claimant in fact meets or medically equals listing 11.19. *See Robinson*, 667 F. Supp. 2d at 843 (noting that "the question is not whether the ALJ should have concluded that Robinson met Listing 11.19's requirements; it is only whether the evidence was substantial enough to require the ALJ to discuss the Listing.").

## 2. Listing 11.03: Epilepsy, Nonconvulsive

We do not reach the same conclusion as above with respect to listing 11.03 for nonconvulsive epilepsy. To meet or medically equal that listing, claimant must provide a "detailed description of a typical seizure pattern, including all associated phenomena." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 11.03. Claimant must show that seizures occurred "more frequently than once weekly" despite at least three months of prescribed treatment. *Id.* The reporting physician should indicate the extent to which description of seizures reflects his own observations and the source of ancillary information. *Id.* at § 11.00(A). The seizures must include an "alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." *Id.* at § 11.03.

McKinney failed to present medical evidence to support a finding that he meets or equals listing 11.03. While McKinney, his wife and, his former boss describe McKinney's history of seizures, the medical records themselves are void of, among other things, a detailed description of a typical seizure pattern. Dr. Burda merely references a history of "seizure spasms," without detailed elaboration, and the state agency consultants mentioned claimant's "seizure disorder" only generally in reference to his complaints. Because the claimant did not submit any medical evidence to support a finding that he satisfied the criteria of listing 11.03, the ALJ did not err when he failed to discuss that listing.[6] *See Scheck v. Barnhart*, 357 F.3d 697, 700 (accepting the ALJ's terse discussion on a listing where "there was no evidence which would support the position that [claimant] met or equaled the listing."). Claimant's request for remand on this issue is denied.

### D. The ALJ Erred in Failing to Assess the Credibility of Claimant's Statements Regarding Headaches.

Next, McKinney contends that, for a number of reasons, ALJ Fina erred in assessing the claimant's credibility. We agree, but only in part.

Pursuant to Social Security Ruling 96-7p, when a claimant has "a medically determinable physical or mental impairment that could reasonably be expected to produce the [claimant's] symptoms, the ALJ must evaluate the intensity, persistence,

---

[6] We also reject claimant's argument that the ALJ was required to call a medical expert to determine whether McKinney satisfied the criteria for listing 11.03. As the Commissioner notes, the decision to call a medical expert is within the ALJ's discretion. *See* 20 C.F.R. § 404.1527(f)(2)(iii) ("Administrative law judges *may* also ask for and consider opinions from medical experts...on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart.") (emphasis added). Given the record before us on this issue, we easily conclude that the ALJ did not abuse his discretion.

and functionally limiting effects of the symptoms to determine the extent to which the symptoms affect [the claimant's] ability to do basic work activities." SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). In doing so, the ALJ must make a "finding about the credibility of the [claimant's] statements about the symptom(s) and its functional effects." *Id.* at *1. Since the ALJ is in a superior position to assess the credibility of a witness, the reviewing court may only disturb a credibility finding if it is "patently wrong," that is, unreasonable or unsupported. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

As an initial matter, we reject claimant's contention that the ALJ's use of boilerplate language alone requires remand. In explaining his credibility finding, ALJ Fina stated: "I find that claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects are not credible to the extent that they are inconsistent with the above residual functional capacity." (R. 14.) Claimant is correct in stating that the Seventh Circuit frowns upon the use of such conclusory language absent further elaboration. *See e.g., Brindisi v. Barnhart,* 315 F.3d 783, 787-88 (7th Cir. 2003); *see also* SSR 96-7p at *4 ("The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.") However, ALJ Fina did not stop with the boilerplate statement, but went on to explain his credibility anlaysis. Unfortunately, that analysis is otherwise deficient.

Here, ALJ's Fina's error lies in his failure to address claimant's statements regarding his severe headaches associated with syringomyelia and Chiari malformations (both of which the ALJ determined to be severe impairments). Claimant

testified that he experienced "massive headaches" that caused pain in the back of his head at the place of his surgery. (R. 50.) McKinney stated that, following the headaches, he becomes discombobulated and needs to sleep because Aspirin provides little relief. (*Id.*) He testified that the headaches forced him to leave work early from PACS "a week's worth" out of every month. (R. 49.)

The medical records provide further documentation of claimant's headaches. On April 14, 2005, a Palos Community Hospital physician noted that claimant entered the emergency room complaining of a headache associated with syringomyelia and Chiari malformations. (R. 264.) The third-party submissions also document the effect of claimant's headaches. Specifically, claimant's former boss, Wojcik, stated that claimant suffered from severe headaches, after which he would appear incoherent. (R. 302.)

ALJ Fina only referenced claimant's headaches in passing, when he discredited Wojcik's statement regarding the severity of those headaches. While ALJ Fina was free to discredit Wojcik's statement (with proper explanation), his failure to address claimant's own testimony proves fatal given that the VE testified that an individual who was off task for 15% of the day due to spasms or headaches would be "intolerable." (R. 58.) *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (remanding when the ALJ failed to analyze the credibility of claimant's statements regarding headaches caused by Chiari malformations.) On remand, the ALJ must properly assess the credibility of claimant's statements regarding headaches and, to the extent that he accepts those statements, explain the effect of the headaches on his ability to perform work related activities.

Lastly, recognizing that further proceedings on remand may require a new RFC

determination, we do not address all of claimant's arguments on that issue. It bears

mentioning, however, that the ALJ did not err in limiting the claimant to sedentary work

when the agency consultants found that he essentially had no exertional limitations.

*See Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) (noting that "the ALJ is not

required to rely entirely on a particular physician's opinion"). In any event, on remand,

the ALJ should take care to consider all of claimant's limitations and restrictions that are

attributable to medically determinable impairments, even those that are not "severe."

*See* SSR 96-7P, 1996 WL 374186 (S.S.A. July 02, 1996).

**III.  CONCLUSION**

For all of these reasons, McKinney's motion for summary judgment is granted in

part and denied in part as set forth above. This case is remanded to the Social Security

Administration for further proceedings consistent with this opinion. It is so ordered.

**ENTERED:**

**MICHAEL T.  MASON**
**United States Magistrate Judge**

**Dated:  August 22, 2011**